BRAWLEY, District Judge.
I dissent. Hyer and Shield were rival promoters, each seeking from the city council of Richmond a franchise for a street railway on Broad street, and both looked to Stewart, a banker in Hew York, for the money to carry out the enterprise. Hyer had already obtained a franchise from the council, and was asking for some amendments thereto. Stewart, fearing that the continued rivalry might result in the defeat of both, or in the obtaining of a franchise of such nature that capital would not embark in it, advised the parties to come together, and they united in an agreement for mutual co-operation, and for an equal division of whatever profits were realized. The agreement does not, on its face, bear any of the indicia which mark a dishonest purpose. It does not show, nor can it be reasonably inferred, that any sinister, extraneous, or corrupting influences were to be brought to bear upon the city council of Richmond to superinduce the granting of the franchise, nor is it alleged that any improper means were to be used to accomplish it, and thus it is cleanly distinguished from all that class of cases where the courts have held contracts void as reeking with corruption, such as using official influence for private gain, securing public office for pay, retiring from competitive candidacy under agreements to divide fees, securing public contracts upon like terms, or bargains for lobbying services to influence legislation. Hone of those elements enter here, and the sole ground upon which the decision rests is that the agreement was calculated to diminish competition for the obtaining of the franchise. It is not contended, nor can it be assumed, that Hyer or Shield, either or both, had such control or monopoly of the building of street railways that they could, by combination, put up the price, or demand an unusual or unreasonable franchise, or embarrass the city of Richmond, and thus injure or jeopardize the public interest, either by their action or nonaction. A rule that might be justly applicable to a kind of business which could not be restrained to any extent whatever without prejudice to the public interest ought not to be arbitrarily extended so as to interfere with that freedom of contract which is a fundamental right. The franchise in question was not a thing that was put up at public auction, and bound to go to the lowest bidder, where a combination to chill the bidding might be held to be in contravention of the public interest. The city council of Richmond, faithful, as it must be assumed, to its obligations to the public, was not bound to give the franchise to this or any other combination except upon such terms as it chose to annex, and there was no agreement for any corrupting influences to affect its action. An honest co-operation between two parties to effect an *847 object which neither could accomplish by itself is not forbidden,. although, in a sense, that might tend to lessen competition. There is a competition that kills, as there is a combination that saves. Competition in itself is not invariably a public benefit, and, to hold a contract void because its tendency may be to defeat competition, it must appear that the benefit to be derived from it is certain and-substantial, and not theoretical and problematical. The rivalry of' impecunious promoters in the obtaining of a franchise for an important public work requiring large capital for its fulfillment is not of such certain advantage to the public that the law should be invoked to prevent its suppression. When such men discover a field! where capital can be profitably employed, and, seeking its aid at the same source, are informed that the money necessary to develop it can only be obtained upon the condition of their joint co-operation, and they voluntarily combine in furtherance of the enterprise, there can be no objection to it if it is done honestly and in good faith. Unless such a contract, either on its face or viewed in the light of the circumstances surrounding it, clearly discloses the fact that improper means and influences are to be used to accomplish the desired end, it should be sustained. “If there is one thing,” says Sir George Jessel in a recent case, “which, more than another, public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice.” All presumptions are in favor of the legality of contracts; all reasonable intendments are indulged to support them; if capable of a construction that will uphold and make them valid, they are not to be held illegal unless the circumstances are so strong and pregnant that no other reasonable conclusion can be drawn from them, for intention to violate the law is not to be presumed.
The extent to which the doctrine of invalidating contracts of this nature may be safely carried is not clearly defined, and there is no immutable standard by which, this rule is to be tested. Within it are clearly embraced all cases of fraudulent acts, and all combinations having for their object the stifling of fair competition at bid-dings with the design to become purchasers at a price less than the fair value of the property, but combinations for mutual convenience, with a view to enable parties to do in common what neither could do individually and which do not disclose a dishonest purpose, are as clearly not within the rule. Courts must determine each case according to its peculiar facts and circumstances, and can only determine rightly when those circumstances are considered in their relation to the reason and grounds of the rule. In Atcheson v. Mallon, 43 N. Y. 147, the case cited in support. of the adverse view,. Justice Folger says:
“But a joint proposal, the result of honest co-operation, though it might prevent the rivalry of the parties, and thus lessen competition, is not an act forbidden by public policy. Joint adventures are allowed. They are public and. avowed, and not secret. The risk, as well as the profit, is joint, and openly assumed. The public may obtain at least the benefit of the joint responsibility and of the joint ability to do the service. The public agents know then all that *848 there is in the transaction, and can more justly estimate the motives of the bidders, and weigh the merits of the bid.”
That Hyer and Shield had made this agreement was no secret. The fact was published in the newspapers in Richmond on the afternoon before the city council passed the ordinance granting the franchise, and we have no complaint from that city—from the party supposed to be injuriously affected—that the suppression of competion has induced the granting of a franchise not duly regardful of the public interests. The bill states that it was Hyer’s intention to lay the whole matter of this agreement before the city council, and there is no ground for the suspicion that there was any concealment. I have not thought it necessary to consider carefully the effect upon this contract of the rule stated by Lord Cottenham in Sharp v. Taylor, 2 Phil. Oh. 801, and approved in McBlair v. Gibbes and Brooks v. Martin and other cases in this country, although I am inclined to the opinion that the doctrine there announced is directly applicable. Here the contract to obtain the franchise which is held to be illegal has been consummated, the franchise has been obtained, the aid of the court is not sought to enforce it, nor can the franchise be in any manner affected by what it may do; the transaction alleged to be illegal is completed and closed; one of the parties is in possession of all the fruits, and the other seems to me to be entitled to recover in an appropriate action his share of the realized profits. Public policy requires that men should perform their contracts, and they ought not to be allowed to evade their obligation upon vague and shadowy grounds. If this were a proceeding on the part of the city of Richmond to vacate the charter on the ground that it was obtained by any corrupt practices, or by the suppression of fair competition, the court should lend attentive ear to every suggestion of improper conduct on the part of the promoters; but the judicial conscience should not be awakened for the protection of one who seeks to avoid a ■contract of his own seeking on the ground that it was immoral, and therefore that he has the right to make off with the swag. Those who have legitimately invested their brains and capital in this enterprise of public utility should not be harassed by the injunctions and other processes which would impede its successful consummation, but the plaintiff is, in my opinion, entitled to an accounting and to a share of the profits realized by his co-promoter, and the bill, limited in its scope to that object, should be retained.